# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| John Eakin, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. |
| | § | |
| United States Department of Defense, | § | SA-10-CV-0784 FB (NN) |
| Robert M. Gates, in his Official | § | |
| Capacity as Secretary of Defense, | § | |
| United States Department of the Army, | § | |
| John McHugh, in his Official | § | |
| Capacity as Secretary of the Army, | § | |
| | § | |
| Defendants. | § | |

## REPORT AND RECOMMENDATION

TO:    Honorable Fred Biery
       Chief United States District Judge

This report and recommendation addresses the pending motions for summary judgment,[1] motion to strike affidavit,[2] and motion to strike response.[3] I have authority to enter this report and recommendation under 28 U.S.C. § 636(b) and the district court's order referring all pretrial matters to me for disposition by order or to aid the district court by recommendation where my authority as a magistrate judge is

---

[1] Docket entry #s 19 & 25.

[2] Docket entry # 26.

[3] Docket entry # 30.

statutorily constrained.[4]  After considering the motions, the applicable law and the summary-judgment evidence, I recommend summary judgment in favor of the defendants for the reasons provided below.

   **Background of the case**.  This case flowed from two requests for government information by plaintiff John Eakin.  Eakin represents himself as "provid[ing] professional aviation mishap investigators with aircraft service history information from the most complete collection of aviation mishap and service history information on earth."[5]  Previously, Eakin developed an interest in identifying unidentified remains of American military service members who died during World War II.  Eakin's interest flowed from his hobby of researching his family's history.

   Eakin's cousin, Arthur H. Kelder, was an U.S. Army soldier who died in a Japanese prison camp during World War II.  Kelder's remains were not returned to his family.  In researching his family history, Eakin learned that the information the Army provided to Kelder's family misrepresented the state of Kelder's remains.  Motivated perhaps by his belief "that every American Hero deserves better than to have his bones wrapped in a tarp; hauled to the cemetery in the back of a truck; and then interred

---

   [4]Docket entry # 3.

   [5]John Eakin Air Data Research, http://www.airsafety.com/ (last visited Nov. 16, 2011).

without religious or military ceremony,"[6] Eakin began communicating with the Army about Kelder's remains and ultimately obtained information to identify Kelder's remains.

As part of his efforts, Eakin "bec[a]me aware that a great number of American Servicemembers who had died in POW camps had not been identified simply because of the ineptness, incompetence and corruption of the US government and that the records of th[e] mismanagement had been classified as a defense secret to keep the knowledge from the American public."[7] Eakin "decided to locate family members for...the other nine servicemembers originally interred with [his] cousin."[8] Ultimately, Eakin's interest grew to include the identities of thousands of unknown service members who died in the Philippines as World War II prisoners of war. This case flowed from that effort.

**Nature of the lawsuit.** Two requests under the Freedom of Information Act (FOIA) lie at the center of this dispute. Eakin sent the first request to defendant U.S. Department of Defense (the DOD) on July 29, 2010.[9] The request asked for the

---

[6]Docket entry # 19, p. 4.

[7]Docket entry # 19, p. 5.

[8]Docket entry # 19, p. 6.

[9]Docket entry # 19, ex. A.

3

following quoted information:

- Consolidated extracts of camp death rosters for Camps O'Donnell and Cabanatuan
- Individual Deceased Personnel Files for all American service members and American civilian employees of the US armed forces whose remains were not recovered or identified. (Alternatively, individual deceased personnel files for only those American personnel who are referenced in the below requested X-files.)
- X-files pertaining to unidentified remains, including (but limited not to):
  - Camp Cabanatuan Cemetery
  - Camp O'Donnell Cemetery
  - Manila Cemetery # 2
  - Manila Mausoleum
  - Manila ABMC Cemetery[10]

"X-files" document information about unidentified remains.[11] Eakin asserted that he is

a representative of the news media and asked the DOD to provide the information at no

cost on an expedited basis. He also asked the government to copy responsive

documents to electronic files rather than produce hard copy documents.

The DOD determined that: Eakin is not a representative of the news media, Eakin

must pay for the requested information at the established DOD fee rate schedule, and

---

[10]*Id.*, p. 1.

[11]According to Dr. Cynthia A. Chambers, Deputy Director of Research and Analysis, World War II Division for the Defense Prisoner of War/Missing Personnel Office, X-files were created by the American Graves Registration Service. Docket entry # 25, ex. C, ¶ 6. The files contain such information as reports on the conditions and locations of remains, personal effects found with remains, wreckage or hardware found near the remains, and details about burial, reburial and recovery.

Eakin's request does not meet the criteria for expedited processing.[12]  Eakin appealed

the determination.  Before the DOD resolved the appeal, Eakin sent the second FOIA

request to the Department of the Army (the Army).

On September 20, 2010, Eakin asked the Army for the same information, except

that he did not ask for the consolidated extracts of camp death rosters for Camps

O'Donnell and Cabanatuan.[13]  He again asserted that he is a representative of the news

media, requested expedited processing, and asked for the information at no cost.  The

Army denied the requests for a fee waiver and expedited processing.[14]  After the DOD

and the Army failed to resolve his appeals within the time provided for by the FOIA,

Eakin filed this lawsuit to challenge the denials of his requests.[15]

**Nature of the lawsuit**.  The FOIA provides for judicial review of denials of

document production, requests for fee waivers, and requests for expedited processing.[16]

Although Eakin sought review under the FOIA and the Administrative Procedures Act

---

[12]Docket entry # 19, ex. A, pp. 7-10.

[13]*Id.*, ex. B, p. 1.

[14]*Id.*, ex. B, pp. 11-13.

[15]The FOIA requires a plaintiff to exhaust his administrative remedies prior to filing a lawsuit.  There is no dispute about whether Eakin exhausted his administrative remedies.

[16]5 U.S.C. § 552(4)(C) (iii).

(APA), there is no independent basis for review under the APA.[17]  As to the claim for relief under the FOIA, Eakin maintains the DOD and the Army (together, the government) unlawfully and unreasonably withheld documents.[18]  He also contends that the denials for his requests for expedited processing and fee waivers violated the FOIA.  Eakin moved for summary judgment, asserting that he is entitled to a fee waiver because his requests are in the public interest and because he is a representative of the news media.[19]

The government also moved for summary judgment.[20]  The government argued that the agencies correctly determined that Eakin is not a representative of the news media and that Eakin's requests do not serve the public interest.  The government also argued that Eakin's request is unreasonable.  The government estimated that it would take a decade to produce the requested documents in electronic form.

Summary judgment is appropriate "if the movant shows that there is no genuine

---

[17]*See Inst. for Wildlife Protection v. U.S. Fish and Wildlife Serv.*, 290 F. Supp. 2d 1226, 1229 (D. Or. 2003) (where complaint sought relief under the APA as well as under FOIA, finding "no provision of the APA (other than FOIA) which provides for the disclosure of documents or for the waiver of fees" and explaining that "[t]he FOIA is part of the APA and was originally enacted because the public disclosure section of the APA...had proven ineffective in providing disclosure of documents to the public.").

[18]Docket entry # 13.

[19]Docket entry # 19.

[20]Docket entry # 25.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."[21]

**Subsequent pleadings.** Since the motions were filed, Eakin advised the court that the government produced "a substantial quantity of digital documents not previously acknowledged by Defendants" and characterized the motions for summary judgment as moot.[22] Eakin asserted that the only issues for the court to decide are: (1) whether his requests are in the public interest, (2) whether Eakin is a representative of the news media, and (3) whether the government incorrectly calculated the fees associated with his requests.  Eakin characterized the government's production of documents as selective and asked the court to sanction the government to deter future misconduct.

The government responded and produced summary judgment evidence showing that the referred-to digital documents were produced in response to a third FOIA request for "digital copies of all WWII era (1941-1945) Individual Deceased Personnel Files (IDPFs) and X-files in the possession of your command which have been digitized in to a machine readable format."[23]  Because documents responsive to the third

---

[21]Fed. R. Civ. P. 56(a).

[22]Docket entry # 30.

[23]Docket entry # 31, ex. F, p. 2.

request fall outside the scope of this lawsuit, the pending motions for summary judgment are not moot.  In a subsequent pleading, Eakin withdrew his motion for sanctions.[24]

**Withheld documents.**  The FOIA requires governmental agencies to make governmental records "promptly available" upon a request "which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed."[25]  As to Eakin's first FOIA request, the DOD produced some records, denied Eakin's request for a fee waiver, and advised Eakin about the agency's efforts to produce records responsive to the request. The DOD stated that it had asked "the responsible component to provide...a preliminary fee estimate, in terms of the number of search hours likely to be required to search for the records" and stated that it would communicate with Eakin again if the estimate exceeded Eakin's  $250.00 agreed-to fee limit.

The DOD component responsible for the requested records—the Army—denied Eakin's requests for a fee waiver and expedited processing.  The Army estimated the cost of copying requested records as $24,000.00.  The Army explained that to obtain the records, Eakin must indicate his willingness to pay applicable fees.

---

[24]Docket entry # 32.

[25]5 U.S.C. § 552(a)(3)(A).

Because Eakin did not indicate he would pay the fees, and instead sought judicial review of the denials of his requests for fee waivers and expedited processing, this case is not about the withholding of documents. Eakin seeks the documents at no cost and prioritized over other FOIA requests. Eakin wants the government to scan responsive, fragile, paper documents and to produce the resulting electronic files. The government did not deny Eakin's requests. Instead, the government denied the requests for production per Eakin's terms. Thus, the court need not decide whether the government withheld documents, but instead the court must determine whether Eakin is entitled to the documents at no cost and whether the government must prioritize Eakin's requests over other FOIA requests.

**Fee waiver.** "In any action by a requester regarding the waiver of fees under [the FOIA], the court shall determine the matter de novo: *Provided*, That the court's review of the matter shall be limited to the record before the agency."[26] Generally, FOIA requesters must pay reasonable charges associated with processing requests, to include search, review and duplication charges.[27] To qualify for a waiver, the requestor must show that "the disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding or operations or activities of the

---

[26] 5 U.S.C. § 552(a)(4)(A)(vii).

[27] 5 U.S.C. § 552(a)(4)(A).

government and is not primarily in the commercial interest of the requester."[28]  As to

the latter showing, nothing in the record suggests Eakin has a commercial interest in the

requested information.  As to the first showing, Eakin cannot demonstrate the

disclosure of the documents serves the public interest.

**Public interest.**  Under the DOD regulations, a FOIA requester must satisfy four

factors to show the disclosure of requested information is in the public interest: "(1) the

subject of the requested records must concern the 'operations or activities' of the

government; (2) the disclosure must be 'likely to contribute' to an understanding of

government operations or activities; (3) the disclosure of information must contribute to

the public's understanding; and (4) the disclosure must be likely to contribute

'significantly' to public understanding of government operations or activities."[29]

As to the first and second factors, Eakin argued that the documents "will

significantly contribute to the public's understanding of the government's activities to

identify deceased American servicemembers,"[30] but the summary-judgment record

shows that the requested documents pertain to individuals.  The summary-judgment

evidence show the requested documents consist of: the Army's interment reports for

---

[28]5 U.S.C. § 552(a)(4)(iii).

[29]*Jud. Watch v. United States DOJ*, 133 F. Supp. 2d 52, 54 (D.D.C. 2000). *See* 32
C.F.R. § 286.28(d) (fee waivers).

[30]Docket entry # 19, p. 14.

individual servicemembers, disinterment records to move the remains of individual deceased servicemembers from the Philippines to the United States, reports of physical and dental examinations of individual deceased servicemembers, non-recoverable case files for individual servicemembers, and correspondence between the Army and the families of individual deceased servicemembers.[31]

As to the third factor, "[t]he key element in determining the applicability of this factor is whether disclosure will inform, or have the potential to inform the public, rather than simply the individual requester or small segment of interested persons."[32] The best measure of public interest lies in Eakin's FOIA requests. Eakin asserted in his requests that he will use the requested documents to "[c]reate a database of MIA/POWs whose remains were determined to be non-recoverable and were interred as unknowns, associated X files, their family members and last known location."[33] Eakin stated that he intended to use the documents to generate publicity designed to locate family members and to encourage family members to provide DNA family reference samples so as to facilitate the identification of unidentified remains. Eakin alleged that the best family reference samples are passed through a continuous maternal or paternal line, a line that

---

[31]Docket entry # 19, ex. G.

[32]32 C.F.R. § 286.28(d)(3)(i)(C).

[33]Docket entry # 19, ex. A, p. 3 & ex. B, p. 3.

11

becomes more unavailable over time because those who are most concerned and most qualified to provide the samples are elderly or deceased.[34] Eakin explained that the requested information is more than 60 years old, such that surviving family members of unidentified deceased service member are now of advanced age and that many of the best DNA donors have died.

Eakin's explanation shows that the public interest in the requested documents is limited to the surviving parents, siblings, and children of American service members and civilian employees who died during World War II in the Philippines and whose remains were unrecovered or unidentified.  Because of the passage of time, the number of interested persons is necessarily a small segment of the public.  That segment may have been larger immediately following WWII, but the passage of time—now over 65 years—decreased the number of persons interested in identifying the remains of unrecovered and unidentified remains of persons who died during WWII.  While Eakin's efforts may be noble, the requested disclosure will not inform, and does not have the potential to inform, a larger segment of the public.  Instead, the disclosure promises to inform a small segment of the public, a segment which will continue to decrease.  In the absence of a contribution to the public's understanding of government operations or activities, the government correctly determined that Eakin was not

---

[34]Docket entry # 13, ¶¶ 66-71.

entitled to a fee waiver on the basis of contribution to the public interest.

**Representative of the news media.**  In addition to the public-interest fee waiver, the FOIA provides for fee waivers for certain categories of requesters.  Relevant here, FOIA fees are "generally limited to document duplication costs when the records are sought by 'a representative of the news media.'"[35]  The FOIA defines "a representative of the news media" as "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."[36]

Eakin relied in large part on his work in the field of aviation accident investigation in seeking a representative-of-news-media waiver.  Eakin asserted that his work in the area of aviation accident investigation has been frequently published and that he has been quoted in many regional and international publications.  He also stated that he publishes current aviation safety news on his website, www.airsafety.info.  Those efforts, however, are directed toward professional scholarship in the area of aviation accident investigation and advertising Eakin's services as an aviation mishap investigator, not toward gathering information of potential interest to a segment of the public.

---

[35]*Southam News v. U.S. Immigr. & Naturalization Serv.*, 674 F. Supp. 881 (D.D.C. 1987).

[36]5 U.S.C. § 552(a)(4)(A)(ii).

Eakin also relied on his efforts in researching and publicizing the disposition of his cousin's remains and nine other unidentified persons interred with this cousin. While commendable, those efforts do not constitute gathering information of potential interest to a segment of the public, using editorial skills to turn raw materials into a distinct work, and distributing that work to an audience. The public interest in those efforts is limited to the families of the ten decedents, with the exception of the general public interest generated by Eakin in local news stories. Eakin may have contributed information that actual representatives of news media described in newspaper articles, but those efforts did not make him a representative of the news media.

Eakin is not employed by a television or radio station broadcasting and/or communicating to the public at large or a publisher of a periodical. Eakin purported to have a commitment from a national news organization to publish a feature article using information he provides,[37] but Eakin's potential contribution to such a story does not make him a freelance journalist. In addition, Eakin's reliance on his website memorializing "the thousands of American servicemen who were imprisoned and died of starvation, disease and mistreatment on the Bataan Death March and in Japanese prison camps in the Philippines during World War II"[38] does not make Eakin a

---

[37]Docket entry # 25, ex. A, p. 4.

[38]Bataan Missing: Return Then to Their Families Now, www.bataanmissing.com (last visited Nov. 16, 2011).

14

representative of the news media.[39]

Moreover, it is questionable whether the sought-after information constitutes "news." The DOD regulations define "news" as "information that is about current events or that would be of current interest to the public."[40] The information Eakin seeks is historical in content. No reasonable interpretation of the FOIA indicates Congress intended for the government to waive fees simply because a requestor intends to share requested information with the public. The government correctly determined that Eakin is not a representative of the news media and thus properly denied Eakin's request for a fee waiver on that basis.

**Expedited processing.** The FOIA directs governmental agencies to "process as soon as practicable any request for records to which the agency has granted expedited processing…."[41] To obtain expedited processing, the requestor must demonstrate a compelling need.[42] The FOIA defines "compelling need" in the following two

---

[39]*See Brown v. U.S. Pat. & Trademark Office*, 445 F. Supp. 2d 1347, 1357 (M.D. Fla. 2006) ("[T]he presence of a website alone does not qualify a FOIA requester as a representative of the news media."); *Jud. Watch*, 122 F. Supp. 2d at 20-21 ("Merely making information available to the public does not transform a requester into a representative of the news media.").

[40]32 C.F.R. § 286.28(e)(7)(I).

[41]5 U.S.C. § 552(a)(6)(E)(iii).

[42]5 U.S.C. § 552(a)(6) (E)(i)(I).

circumstances:

> (I) that a failure to obtain requested records on an expedited basis…could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or
>
> (II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.[43]

In making his request for expedited processing, Eakin relied on the second circumstance.

Under the DOD regulations, representatives of the news media ordinarily qualify as "an individual primarily engaged in disseminating information in order to inform the public," but others "must demonstrate that their primary activity involves publishing or otherwise disseminating information to the public."[44]  Eakin is not a person primarily engaged in disseminating information.  Eakin is a person primarily engaged in "searching for reports of aviation mishaps and mechanical difficulties…."[45]  While his pleadings indicate he is passionate about "locat[ing] and contact[ing] family members

---

[43]5 U.S.C. § 552(a)(6) (E)(v).  *See also* 32 C.F.R. § 286.4(d)(3)(ii) ("Compelling need also means that the information is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity.").

[44]32 C.F.R. § 286.4(d)(3)(ii).

[45]John Eakin Air Data Research, http://www.airsafety.info/Services/ (last visited Nov. 16, 2011).

of...unknown service member[s] who died while a prisoner of the Japanese Government in the Philippine Islands and provid[ing] them with documents appropriate to their family members,"[46] Eakin's passion does not make him a person primarily engaged in disseminating information any more than his interest in identifying the remains of unknown decedents make him a representative of the news media.

Nor has Eakin set forth an urgent need. Under the DOD regulations, "[u]rgently needed means the information has a particular value that will be lost if not disseminated quickly."[47]  Eakin identified the particular value as providing surviving family members with "information concerning the death of their family members by the actions of, and for the convenience of, the US Military forces."[48]  Eakin asserted that his need for the information is urgent due to the continuing deterioration of unknown remains and the difficulty in locating family members to provide reliable family reference samples. Surviving family members, however, may provide family reference samples regardless of whether the requested documents are provided to Eakin on an expedited basis. Eakin's summary-judgment exhibits show that the government solicits

---

[46]Docket entry # 19, ex. A, p. 2.

[47]32 C.F.R. § 286.4(d)(3)(ii)(A).

[48]Docket entry # 19, ex. A, p. 5.

family reference samples.[49]  Expediting the disclosure of the information to Eakin will

not impact the deterioration of unknown remains or the difficulty in locating family

members to provide reliable family reference samples.  If surviving family members

want to provide the government with family reference samples, they may do so without

Eakin's assistance.

    To the extent Eakin relies on informing the public about the government's lack of

diligence and mistakes made by US graves registration personnel,"[50] that interest is

historical, not current.  That the U.S. military made mistakes and misrepresentations in

the recovery of service members who died in the Philippines is not a breaking news

story of general public interest.  An example of breaking news would be that the U.S.

military is making mistakes and misrepresentations about the recovery of service

members who die in Iraq and Afghanistan.[51]

---

[49]Docket entry # 19, ex. J (web pages: Defense Prisoner of War/Missing Person
Office & Joint POW/MIA Accounting Command).

[50]Docket entry # 19, ex. A, p. 14

[51]*See* Jill Laster, *Lawmakers Seek Answers on Mishandled Remains*, Air Force Times
(Nov. 9, 2011), http://www.militarytimes.com/news/2011/11/air-force-lawmakers-
seek-answers-on-mishandled-remains-110911w/ (reporting the results of an Office of
Special Counsel investigation reporting the mishandling of the remains of
servicemembers killed in Afghanistan); Elisabeth Bumiller & James Dao, *Air Force
Officials Disciplined Over Handling of Human Remains*, New York Times, N.Y. Times, Nov.
8, 2011 (reporting that three senior Air Force officials were reprimanded because they
knew about the lost body parts of two service members killed in Afghanistan but did
nothing to correct the sloppy practices leading to the losses).

The DOD regulations also provide for expedited processing based on "an imminent loss of substantial due process rights and humanitarian need."[52] Eakin asserted that "[f]amily members of the deceased service members, including the requester, have been deprived of the right of due process in seeking judicial review of the US Government's finding of non-recoverability of the remains of the persons who are the subject of the requested files."[53] To the extent, Eakin asserts a due process right on behalf of family members of the deceased service members, Eakin lacks standing to the assert the rights of others. To the extent Eakin asserts a right on behalf of himself as the requester, Eakin has not been denied due process. The government provided documents relevant to his family member.

As a humanitarian need, Eakin identified the "consideration of the advanced age of family members of the deceased service members who have been deprived of information concerning the death of their family member by the actions of, and for the convenience of the US military services."[54] Under the DOD regulations, "[h]umanitarian need means that disclosing the information will promote the welfare and interest of mankind." The requested documents do not implicate the welfare and

---

[52] 32 C.F.R. § 286.4(d)(3)(B)(iv).

[53] Docket entry # 19, ex. A., p. 4.

[54] Docket entry # 19, ex. A., p. 5.

19

interest of mankind.[55]  The government properly denied Eakin's request for expedited processing.

**Unreasonableness.**  The government asked for summary judgment, in part, by arguing that Eakin's request imposes an unreasonable burden upon the government.[56] To support its argument, the government presented an affidavit by Dr. Cynthia Chambers.  Chambers is the Deputy Director of Research and Analysis, World War II Division for the Defense Prisoner of War/Missing Personnel Office, a DOD field activity. Dr. Chambers attested that Eakin's requests require processing of millions of pages of government records and conducting a manual page-by-page, line-by-review to redact materials exempted by the FOIA.[57]  Dr. Chambers opined that it would take the next decade to scan applicable paper files and that producing responsive documents will detract from the agency's worldwide mission of recovering WWII missing.[58]

Eakin responded and argued that the government is precluded from relying on unreasonableness because the government did not rely on unreasonableness in denying Eakin's requests.  Eakin asked the court to strike Chambers's affidavit, in part, because

---

[55]32 C.F.R. § 286.4(d)(3 )(B)(iv).

[56]Docket entry # 25, pp. 7-14.

[57]Docket entry # 25, p. 13 & ex. C.

[58]Docket entry # 25, ex. C, p. 16.

it is outside the administrative record.[59] The government maintained that it is not

precluded from filing an affidavit to assist the court in considering summary

judgment.[60] Thus, the court must decide whether to consider Chambers's affidavit and

the government's unreasonableness argument.

The FOIA limits judicial review to the record before the agency. Previously, the

Ninth Circuit determined that a court reviewing the denial of a fee waiver "cannot

consider new reasons offered by the agency not raised in the denial letter."[61] Although

the Fifth Circuit has not addressed this issue, courts outside Ninth Circuit jurisdiction

have universally applied the rule.[62] Because the FOIA restricts judicial review of fee-

---

[59]Docket entry # 26.

[60]Docket entry # 28, pp. 6-7.

[61]*Friends of the Coast Fork v. U.S. Dep't of the Interior*, 110 F.3d 53, 55 (9th Cir. 1997).

[62]*See W. Watersheds Project v. Brown*, 318 F. Supp.2d 1036, 1039 (D. Idaho 2004) ("[T]he district court may not consider reasons not offered by the agency in the denial letter."); *Inst. for Wildlife Prot. v. U.S. Fish and Wildlife Serv.*, 290 F. Supp.2d 1226, 1228 (D. Or. 2003) ("The agency must adhere to the reasons given at the administrative level to prove their case and cannot later employ post hoc rationales...."); *Manley v. Dep't of Navy*, No. 1:07-CV-721, 2008 WL 4326448, at * 2 (S.D. Ohio Sept. 22, 2008) ("[T]he Court may not consider reasons not advanced by the agency in the administrative denial decision."); *Jud. Watch v. Gen. Services Admin.*, No. Civ. A. 98-2223, 2000 WL 35538030, at * 4 (D.D.C. Sept. 25, 2000) ("[T]he court may not consider new reasons by the agency that were not advanced in its denial letter.").

waiver denials[63] and expedited processing to the record before the agency,[64] it is unlikely the Fifth Circuit would deviate from the rule.  Using this reasoning, an "agency must stand on whatever reasons for denial it gave in the administrative proceeding."[65]

Applying that rule here, the court lacks jurisdiction to consider the government's argument that Eakin's requests are unreasonable.  The agency record consists of Eakin's requests, the government's letters responding to the requests, and Eakin's appeals.  The government's responses do not rely on unreasonableness.  Therefore, the court may not consider the government's unreasonableness argument.  Because Chambers's affidavit supports the government's unreasonableness argument, it is appropriate to strike Chambers's affidavit.

**Recommendation**.  The government properly denied Eakin's requests for fee waivers and expedited processing.  For that reason, I recommend granting the government's motion for summary judgment (docket entry # 25) and denying Eakin's motion for summary judgment (docket entry # 19) to that extent.  To the extent the government relied on unreasonableness as a basis for summary judgment, I recommend dismissing that argument as outside the administrative record.  I recommend granting

---

[63]5 U.S.C. § 552(a)(4)(vii) (limiting review to the record before the agency).

[64]5 U.S.C. § 552(a)(6)(E)(iii) (providing that review of denials of requests for expedited review shall be based on the record before the agency).

[65]*Friends of the Coast Fork*, 110 F.3d at 55.

22

Eakin's motion to strike Chambers's affidavit (docket entry # 26) because it supports

that argument. I recommend denying Eakin's motion to strike the government's

response (docket entry # 30) because the response is responsive to Eakin's arguments.

The court, however, need not consider that portion of the government's argument

addressing unreasonableness. To the extent that Eakin sought summary judgment

about the government's calculation of fees, there is no need to consider whether the

government's initial estimate was correct because Eakin asked for the records in

electronic form and the estimate addressed the cost of paper copies. To the extent Eakin

sought review of the government's reliance on the privacy exemption,[66] the government

has since determined the exemption does not apply and produced responsive

information; the argument is moot. Also, because individual officers are not proper

parties to a lawsuit under the FOIA,[67] I recommend dismissing Robert M. Gates,

Secretary of the Department of Defense, and John McHugh, Secretary of the Army, as

defendants. If the district court accepts my recommendations, the district court can

enter a final judgment in favor of the Department of Defense and the Department of the

Army.

**Instructions for Service and Notice of Right to Object/Appeal.** The United

---

[66]Docket entry # 19, pp. 20-22.

[67]*Petrus v. Bowen*, 833 F.2d 581, 582 (5th Cir. 1987) (stating that the FOIA does not create a cause of action against an individual employee of a federal agency).

States District Clerk shall serve a copy of this report and recommendation on all parties

by either (1) electronic transmittal to all parties represented by attorneys registered as a

"filing user" with the clerk of court, or (2) by mailing a copy to those not registered by

certified mail, return receipt requested.  Written objections to this report and

recommendation must be filed within 14 days after being served with a copy of same,

unless this time period is modified by the district court.[68]  Such party shall file the

objections with the clerk of the court, and serve the objections on all other parties.  A

party filing objections must specifically identify those findings, conclusions or

recommendations to which objections are being made and the basis for such objections;

the district court need not consider frivolous, conclusive or general objections.  A

party's failure to file written objections to the proposed findings, conclusions and

recommendations contained in this report shall bar the party from a *de novo*

determination by the district court.[69]  Additionally, failure to file timely written

objections to the proposed findings, conclusions and recommendations contained in this

report and recommendation shall bar the aggrieved party, except upon grounds of

plain error, from attacking on appeal the unobjected-to proposed factual findings and

---

[68]28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

[69]*Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, 200 F.3d 335, 340 (5th Cir. 2000).

legal conclusions accepted by the district court.[70]

     **SIGNED** on November 23, 2011.

*Nancy Stein Nowak*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[70]*Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).



## Aviation Mishap Analysis and Similar Occurrence Research

John Eakin and Air Data Research provide professional aviation mishap investigators with aircraft service history information from the most complete collection of aviation mishap and service history information on earth.

Aviation manufacturers, underwriters, and law firms around the world have relied on us for accurate and complete aircraft accident, incident, and malfunction information since 1991.

*All services are completely confidential and satisfaction is fully guaranteed.*

SA-10-CV-0784 FB (NN)



Firefox ▾   John Eakin - Air Data Research and A...   Bataan Missing | Return Them To The... ×   +

← →   bataanmissing.com   • C   Google   🔍   ☆

Blog Entry - San Anton...   Del Rio Phone Directory   San Antonio Phone Dir...   Office Supplies: Office ...   MyAccount-West-Sig...   ATCOP Sign In   Bookmarks

Log In

# Bataan Missing
Return Them To Their Families Now

**Home**   ▪

SUBSCRIBE VIA RSS OR
EMAIL

☐ Subscribe 🔳 ▾ ▾ ▾ ▸

MORE INFORMATION

Awards for Bataan
Defenders
More Information
Contact Us
FOIA Docket
Cabanatuan Unknowns
2nd General Hospital
Identification

RECENT COMMENTS

admin on The Unknowns
of Cabanatuan Grave 717
Juan F. Gutierrez,
20843123 on The
Unknowns of Cabanatuan
Grave 717

Search & Hit Enter

## Welcome



Grave of an unknown - ABMC Cemetery Manila
Photo courtesy David L. Dwiggins

This site is dedicated to the thousands of American servicemen who were imprisoned and died of starvation, disease and mistreatment on the Bataan Death March and in Japanese prison camps in the Philippines during World War II. They were abandoned by the US Government in 1942 and President Roosevelt succeeded in keeping their fate from the American people for more than a year

After the war their remains were disinterred from the camp cemeteries and those who could be positively identified were returned to their families. Identification required two items of evidence – camp burial records, dog tags and military dental records were used most often. This was a massive job and they usually didn't bother to obtain civilian dental records.

Those remains for which a second item of identification was not available were buried as unknowns in the Manila ABMC Cemetery; their families told only that the remains of their loved one were not recoverable. The records were then classified and hidden from public view for more than sixty years. The headstones said they were known only to God – actually they were known to God and the US Army.

### The Search for Bud

Read more »

## The Unknowns of Cabanatuan Grave 717

During much of the existence of Camp Cabanatuan, all the men who died each day were buried in a single communal grave. Those who died on 19 November 1942 were placed in grave number 717.

This information is taken from the camp death record and you might note that these men are numbers 2,267 through 2,280. To put these numbers in context, Cabanatuan had been open approximately four or five months at this time.

Here's what we know about each of them.

Read more »

## More Than A List – Real People

After reading the list of men buried in grave 717, I was reminded that it wasn't "just" a list. These were young men who left their homes and families in the name of protecting our nation. The American government not only abandoned them, they attempted to hide what they had done from the public. These men endured some of the most brutal, horrific conditions and treatment ever inflicted on American military personnel. They died for America, and many would say they died because of America. Let's not let them be forgotten.

So let me tell you about the guy who started this quest, my cousin Bud Kelder. His name was Arthur Herman Kelder, being named after his grandfathers, but he was always known as Bud or Buddy to the family.

Read more »

## A Must Read File

I'm slowly adding information to this site which others might find interesting and I've just posted a page of references and web links. This page may be opened by clicking on the link in the upper right corner of the main page.

One file in particular is a must read for anyone interested in these POW camps or the men who perished in them. It is ten pages prepared by DPMO Archival Research and is titled
Casualties of the Philippines POW camps O'Donnell and Cabanatuan and the history of their burials

Read more »

## San Antonio Express-News Tells Bud's Story

Bud Kelder's story was nicely told in this front page story in the San Antonio Express-News on Veterans' Day 2010.

## Search Update – 29 October 2010

I can't begin to count the many people who have helped in search for one two Cabanatuan unknowns and to find these families. Old friends

SA-10-CV-0784 FB (NN)
Accessed 11/18/11

I can't begin to count the many people who have helped us search for our ten Canadian unknowns and to find their families. Old friends and neighbors who have gone to considerable trouble to provide a family reference sample. Librarians and historians who have kindly looked up information for us. Genealogists who have pointed us in the right direction when we hit a wall. The Department of Defense personnel who treat their work as much more than just a job. The best part, of course, has been visiting with the families we have found –

SA-10-CV-0784 FB (NN)
Accessed 11/18/11

HOME    ABOUT    SERVICES    FAQ    NEWSLETTER    RESOURCES    CONTACT



# Services

## Custom Database Searches

Our specialty is searching for reports of aviation mishaps and mechanical difficulties while avoiding misleading results. We'll work with you to identify your needs and the most appropriate sources, and there's never a charge for anything you don't find useful.

### Civil Aircraft Accident/Incident Reports

Reviewing mishaps with similar circumstances often provides insight to alternative causal information or details of defects. Custom searches normally include multiple searches of at least two databases.

### Service Difficulty Reports

These reports are useful in identifying a particular system or component and are searchable by airframe/engine/propeller make/model, ATA system code, part number, and many other fields.

### Miscellaneous Sources

Military, Special Airworthiness Information Bulletins, Airworthiness Directives, Type Certificate Data Sheets, and many other electronic and print sources can be reviewed.

### Damage History Searches for Specific Aircraft

These are searches to find all damage reported on a specific aircraft and are typically performed in conjunction with an aircraft title search at the time of purchase.

## Other Services

Custom database searches limit the amount of time ADR can devote to large projects, but we try to accommodate such requests. Past projects include:

Wreckage Examination/Teardown

Witness Interviews

Specialty Database Integration Projects

Flight Test Programs

Technical Expert Selection

Expert Testimony

SA-10-CV-0784 FB (NN)

## Ordering

If you are ready to discuss your inquiry, we invite you to contact us. We generally get the best results if the principal investigator places the order by telephone or email. This allows us to give you an idea what type of information might be available and verify that it will meet your needs. The more detail you can give us, the better the results will be. At a minimum, we need to know what airframe or engine make and model you're interested in. If possible, the system or component, part number, or model number would be helpful.

SA-10-CV-0784 FB (NN)

White Papers | Subscribe | Subscription Renewal | Advertise in Military Times | About Military Times | Customer Service | RSS

# MilitaryTimes

http://www.militarytimes.com/news/2011/11/air-force-lawmakers-seek-answers-on-mishandled-remains-110911w/

# Lawmakers seek answers on mishandled remains

By Jill Laster - Staff writer
Posted : Wednesday Nov 9, 2011 20:31:18 EST

Pressure is mounting on Air Force leadership from lawmakers demanding to know why the service's Dover, Del., mortuary lost and improperly handled remains of the nation's war dead.

Leaders in the Senate's Armed Service's Committee say they are investigating the findings of an Office of Special Counsel probe released Tuesday. The report slammed the Air Force for what it says is a failure to acknowledge mishandled and lost remains.

The Democrat heading the committee, Sen. Carl Levin, announced that his staff has an investigation underway. The same Armed Service subcommittee team that investigated problems last year at Arlington National Cemetery is also looking into the incidents at Dover, Democratic Sen. Claire McCaskill, said in a radio address Tuesday.

## Related reading

• Military families split on mishandled remains (Nov. 9)

• Recent pattern of embarrassing Air Force errors (Nov. 9)

• AF leaders accept blame for mishandled remains (Nov. 8)

• Air Force morgue lost body parts from war dead (Nov. 8)

It's still too early to tell the breadth of the congressional response to the investigation. Sen. Jon Tester, D-Mont., said in a phone interview Wednesday that lawmakers on Capitol Hill will — at a minimum — conduct some sort of congressional hearing. Tester's office has sent a letter to Air Force Secretary Michael Donley requesting a "full explanation of what went wrong and who is accountable."

He also questioned in his letter to Donley why the three supervisors implicated in the Office of Special Counsel report were disciplined but not fired. Col. Robert H. Edmondson, commander of mortuary operations at the time of the incidents, received a letter of reprimand for gross mismanagement and failure of leadership, according to the Office of Special Counsel. He rotated out of the command before the Air Force finished its investigation.

Former mortuary director Quinton Keel was downgraded to a nonsupervisory GS-13 position and is currently serving as the Air Force survivor assistance program manager, a position created specifically for him. Trevor Dean, Edmondson's top civilian deputy, was

SA-10-CV-0784 FB (WMM)

reassigned as the entitlements branch chief in the Mortuary Affairs Division, according to the Office of Special Counsel.

"For those families who have lost a loved one in battle, that's one thing — that's hard enough — but to have their remains mishandled, that's a real violation of public trust," Tester said. "I can't even put into words how totally unacceptable it is."

The Office of Special Counsel investigation confirmed that a fragment of remains of two F-15 crew members, killed when their plane went down in Afghanistan in July 2009, disappeared from a small plastic bag at the mortuary. A Marine's left arm also was sawed off to fit into a military uniform without notification or consent from the family. In another case, a portion of a soldier's remains disappeared, the Office of Special Counsel investigation found.

In five separate cases, fetal remains from military families were shipped to Dover using plastic pails inside non-reinforced, used cardboard boxes, the investigation found. In another case, whistleblowers said mortuary management didn't properly notify staff that they were handling the remains of a contractor who had contagious tuberculosis.

Congressional representatives from Delaware had been following the investigation for two years, long before family members of the fallen troops were told over the weekend of the mishandled remains, according to multiple sources on Capitol Hill.

Sen. Tom Carper, D-Del., said in a statement to Air Force Times that his office was contacted in 2009 regarding issues at the mortuary affairs operations center, and that his office immediately contacted the Defense Department Inspector General.

## Discuss

Improper handling of remains

"My office has maintained ongoing contact for the past 24 months with the Department of the Air Force to make sure the investigation progressed appropriately," Carper said in a statement.

Sen. Chris Coons, D-Del., was briefed about the investigation when he assumed office in November 2010, and all members of Delaware's congressional delegation received updates from the Air Force about the progress of the investigation, congressional staff members said.

The delegation met with Air Force officials on Wednesday and has requested follow-up meetings.

On Tuesday, Defense Secretary Leon Panetta called for a separate investigation. His press secretary, George Little, told reporters that "everyone is aware in the department of these certain discrepancies between" the Air Force's investigation into the incidents and the Office of Special Counsel's report, "and this is something that will continue to be worked."

Little said Tuesday that Panetta "is someone who believes strongly in accountability for mismanagement, misconduct and wrongdoing."

"He is aware of the disciplinary actions that have been levied," Little said. "He, I think, as is the prerogative of any defense secretary, leaves open the possibility for further accountability."

*Staff writers Brian Everstine and Andrew Tilghman contributed to this report.*

Videos You May Be Interested In
TOP VIDEO PICKS by Taboola



**The military and energy use (pa...**
(9m7s)



**Military Times: SitRep Online f...**
(2m9s)



**The Senate's plan to cut**
(5m57s)

**Leave a Comment**

SA-10-CV-0784 FB (NN)